# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MARTY GILLIEHAN,        )
                             )
     **Plaintiff,**          )
                             )
      **vs.**             )     **Case number 4:13cv0288 TCM**
                             )
**CAROLYN W. COLVIN,** Acting   )
**Commissioner of Social Security,**  )
                             )
     **Defendant.**        )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Marty Gilliehan (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in February 2010, alleging he was disabled as of July 1, 2004, because of low back pain, shortness of breath, depression, and arthritis in his knees and shoulders. (R.[1] at 124-34, 168.) His applications were denied initially and after a hearing held in November 2011 before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

8-21, 26-40, 48-58.)  The Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.  (<u>Id.</u> at 1-5.)

### **Testimony Before the ALJ**

Plaintiff, represented by counsel, and John McGowan, a vocational expert, testified at the administrative hearing.

Plaintiff testified that he completed two years of college.  (<u>Id.</u> at 28.)

In 1996 and 1997, Plaintiff worked cleaning officers for Corporate Cleaning Services. (<u>Id.</u> at 28-29.)  He did the same type of work in 1998 for another company.  (<u>Id.</u> at 29.)  In 2000 and 2001, he worked stripping and waxing floors and cleaning and removing carpets for Children's Hospital.  (<u>Id.</u>)  In 2001 and 2002, he worked as a janitor at the St. Louis Library. (<u>Id.</u>)  From 2002 to 2004, he worked cleaning offices for American Building Maintenance. (<u>Id.</u> at 30.)  He has not worked since 2004 because the pain in his knees and back prevented him from doing the work in the allotted time at his last job, so he was let go.  (<u>Id.</u> at 30, 35-36.) Because of his knee problem, he has to sit after standing for twenty minutes.  (<u>Id.</u> at 36.)  Now, he seldom gets out of his chair or bed.  (<u>Id.</u>)  Because of his pain, he does not even try to bend forward.  (<u>Id.</u>)

Asked about the references in the record to Plaintiff using heroin and alcohol, Plaintiff testified that he has "been clean for years."  (<u>Id.</u> at 31.)  He had unknowingly drunk alcohol in September 2010 when he drank what he was erroneously told was nonalcoholic beer.  (<u>Id.</u>) He has been completely clean of heroin for a couple of years.  (<u>Id.</u>)  Before that, he had only used once or twice.  (<u>Id.</u>)

Plaintiff is "in the process" of getting treatment for his hepatitis C. (Id. at 32.)

Plaintiff testified that he uses a cane to help keep his balance. (Id.) A doctor did not prescribe it for him. (Id.) He started using the cane before he was in a bus accident the past April. (Id. at 33.)

Both knees bother him, but the left knee hurts worse. (Id.) He is also having problems with his back. (Id.) He started going to the Hopewell Center the past July because he is depressed and now has Medicaid. (Id. at 33-34.) Before that, he had been seen once at a free psychiatric clinic. (Id. at 34.)

Dr. McGowan was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age (53 at the time of onset), education, and past work experience who can lift and carry twenty pounds occasionally and ten pounds frequently and can sit, stand, and walk each for approximately six hours in an eight-hour work day. (Id. at 37.) This claimant cannot work with any direct contact with food products. (Id.) He can understand, remember, and carry out at least simple instructions and non-detailed tasks. (Id.) Asked if the hypothetical claimant can return to any past relevant work, Dr. McGowan replied that he can perform Plaintiff's past janitorial work cleaning business offices. (Id.) The job, referred to as commercial cleaner, had a *Dictionary of Occupational Titles* (DOT) number of 323.687-014, was light, and had a specific vocational preparation level of 2. (Id.)

If the hypothetical claimant has the restrictions described by Mr. Smith[2] in a Mental Residual Functional Capacity Questionnaire, see pages 19 to 20, supra, there are no jobs he can perform.  (Id. at 38.)

If the first hypothetical claimant is rarely able to bend or stoop, cannot crouch or crawl, and can only stand twenty minutes at one time, he cannot perform the job of a commercial cleaner.  (Id.)

Dr. McGowan further stated that his testimony was consistent with the *DOT* and with the *Selected Characteristics of Occupations*.  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical and mental functional capacities.

When applying for DIB and SSI, Plaintiff completed a Function Report.  (Id. at 197-204.)  Asked to describe what he does during the day, he reported that most of his time is spent trying to sleep or in bed trying to deal with the pain in his knees.  (Id. at 197.)  The meals he prepares are primarily frozen dinners or sandwiches.  (Id. at 199.)  He cannot prepare more complicated meals because they require too much standing.  (Id.)  He does not do any house or yard work.  (Id. at 200.)  He goes outside at least once a day with his sister's dogs.  (Id.)  His

---

[2]Erickson T. Smith, Ph.D., L.C.S.W., is a licensed clinical social worker; he is not a licensed psychologist.  See Mo. Div. of Prof'l Regis., Licensee Search – Active Licensee Only: Primary Source Verification, https://renew.pr.mo.gov/licensee-search-results.asp?passview=1 (last visited Mar. 26, 2014).  For ease of reference, the Court will use the title of "Mr." when referring to him.

sister takes him grocery shopping once a month. (Id.) His only hobbies are watching television and reading. (Id. at 201.) Until 2004, he played sports. (Id.) His impairments adversely affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Id. at 202.) He cannot walk farther than 100 feet before having to sit down for approximately five minutes. (Id.) He can follow written and spoken instructions very well. (Id.) He also gets along very well with authority figures. (Id. at 203.) He handles stress well, but has a hard time dealing with changes in routine. (Id.)

His sister completed a Function Report Adult – Third Party on Plaintiff's behalf. (Id. at 177-84.) She reported that Plaintiff used to daily walk another sister's dogs, but no longer does. (Id. at 178.) Her answers generally mirror his. (Id. at 177-84.)

Plaintiff disclosed on a Disability Report – Appeal form that he had developed heart problems after filing his applications. (Id. at 218.)

On an earnings report, Plaintiff's highest earnings in the fifteen years before his alleged disability onset date were $18,333,[3] in 1996. (Id. at 148.) His lowest earnings were $1,591, in 1995. (Id.) He had no earnings after 2004. (Id. at 148-49.)

The relevant medical records before the ALJ are summarized below in chronological order.

The earliest record is from February 2005, ten months after Plaintiff's alleged disability onset date, when Plaintiff was seen at the Forest Park Hospital after he developed a large abscess necrotizing in his left leg due to a self-injection of heroin. (Id. at 239-60.) Plaintiff

---

[3]All amounts are rounded to the nearest dollar.

was described as having "a history of prolonged IV heroin abuse and heavy alcohol use." (Id. at 241.) He had been routinely injecting heroin for the past seven years and reported that, at least for the past month, "ha[d] been injecting heroin into his legs several times per day." (Id.) He reported that he was employed by his sister as a janitorial contractor. (Id.) Indeed, it was noted that he had checked himself out of the emergency room two days earlier because he had to be at work in the morning.[4] (Id.) He had "a long history of heavy alcohol use," drinking approximately one beer and one to two pints of wine day. (Id.) Plaintiff was treated with intravenous (IV) antibiotics and underwent an incision and drainage (I&D) of the left leg with debridement of the necrotic skin down to the muscle. (Id. at 240, 243, 245.) He was diagnosed with left leg abscess and cellulitis, alcohol abuse, and opioid abuse, and was discharged the next day with prescriptions for Keflex (an antibiotic) and Darvocet.[5] (Id. at 240.)

Plaintiff did not receive medical treatment again until x-rays were taken in June 2010, four months after he filed his DIB and SSI applications, of his lumbar spine, revealing spondylosis at L1-2; a possible old fracture at L1; hypertrophic spur formation; and grade I degenerative spondylolisthesis[6] at L4-5. (Id. at 277.)

_____

[4]The Court notes that Plaintiff has no reportable earnings after 2004.

[5]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited Mar. 25, 2014). It was withdrawn from the United States market in November 2010. Id.

[6]Spondylolisthesis is graded according to the degree of slippage of the bones of the spine onto the vertebra below. Cleveland Clinic, Diseases & Conditions: Spondylolistesis, http://my.clevelandclinic.org/disorders/back_pain/hic_spondylolisthesis.aspx (last visited Mar. 25, 2014). Grade I is the lowest degree of slippage: 1 to 25 percent. Id.

In August, Plaintiff was seen as a walk-in patient by Teresita Cometa, M.D., with St. Louis ConnectCare (SLCC), for treatment of general aches and pains.  (Id. at 424-25, 428.)  Also, he became short of breath after walking a few feet and his chest hurt.  (Id. at 424.)  He drank wine and beer every day and smoked one-half pack of cigarettes.  (Id.)  X-rays of his left knee revealed moderate osteoarthritis of the femorotibial joint and advanced degenerative osteoarthritis of the patellofemoral joint.  (Id. at 428.)  On examination, he had harsh breath sounds.  (Id. at 424.)  Dr. Cometa opined he might have chronic obstructive pulmonary disease.  (Id.)  He was encouraged to stop smoking and was to have lab work done.  (Id. at 425.)  He did. (Id. at 434-35.)

On September 1, Plaintiff returned to SLCC and was seen by Laila Hanna, M.D., for complaints of occasional chest pain and tightness for the past year and of shortness of breath when walking.  (Id. at 421-23, 426-27, 431-33.)  His current medication was tramadol (a pain reliever).  (Id. at 421.)  On examination, he had no chest pain or discomfort, no palpitations, and no shortness of breath.  (Id. at 422.)  He had a normal heart rate and rhythm.  (Id.)  Chest x-rays were negative with the exception of showing minimal interstitial fibrosis at the right lower lobe.  (Id. at 426.)  He was diagnosed with chest pain, elevated liver enzymes, leukopenia (decreased white blood cells), and unspecified, continuous psychoactive substance abuse.  (Id. at 422-23.)  He was to have a chest x-ray and an electrocardiogram (ECG).  (Id. at 423.)  A hepatitis panel was positive for hepatitis C.  (Id. at 431.)  He was using heroin and drinking wine and beer every day.  (Id. at 421.)

Plaintiff returned to Dr. Hanna on September 20 due to the positive test for hepatitis C and being positive for herpes. (Id. at 419-20.) Also, he continued to have left knee pain. (Id. at 419.) He was to consult with a cardiologist, a gastroenterologist, and an orthopedic surgeon. (Id. at 420.) His alcohol and drug use were as before. (Id. at 419.)

On October 4, Plaintiff consulted Alan Zajarias, M.D., a cardiologist. (Id. at 383-85.) Plaintiff explained that he had been having increasing shortness of breath during the past two months and left-sided substernal chest discomfort that increased with activity and decreased with rest. (Id. at 383.) He also had "significant fatigue." (Id.) He used to be a heavy drinker, but now only drank one beer on the weekends. (Id.) He also used to be a heroin user. (Id.) An ECG was normal. (Id. at 284.) A stress ECG was to be obtained. (Id.) If it proved to be abnormal, a cardiac catherterization was to be considered. (Id.) Plaintiff was to limit his physical activity in the interim. (Id.)

Two days later, Plaintiff underwent the stress ECG, revealing no evidence of wall motion abnormalities but evidence of significant ventricular ectopy and couplets. (Id. at 389-91.)

On October 11, Plaintiff consulted a nurse practitioner, Shirley Campbell, N.P., with SLCC for his complaints of knee, back, and shoulder pain that was a five on a ten-point scale and for intermittent abdominal pain. (Id. at 317-19.) He had recently been diagnosed with hepatitis C. (Id. at 317.) He had not used alcohol for a month and heroin for six months. (Id.) He walked with a cane. (Id.) His current medications included tramadol. (Id.) He had shortness of breath when walking short distances, but no chest pain or discomfort. (Id. at 318.)

He had no anxiety or depression. (<u>Id.</u>) With the exception of an abnormal spleen, his examination results were normal. (<u>Id.</u>) Ms. Campbell diagnosed him with chronic hepatitis, C virus, and alcohol abuse in remission. (<u>Id.</u>) He was instructed on the need to be alcohol free for six months before treatment for hepatitis C could begin and was to return in four to six weeks. (<u>Id.</u> at 319.)

Plaintiff underwent a cardiac catherization four days later, following which he was diagnosed with clean coronary arteries and nonischemic cardiomyopathy and prescribed metoprolol (a beta blocker). (<u>Id.</u> at 386-88.)

Plaintiff saw Ms. Campbell again in November. (<u>Id.</u> at 314-16.) He was to continue to abstain from alcohol and return in three months. (<u>Id.</u> at 316.)

Plaintiff returned to Dr. Zajarias on January 5, 2011. (<u>Id.</u> at 381-82.) He reported that he had been feeling well since starting metoprolol. (<u>Id.</u> at 381.) His ability to walk around his house had improved. (<u>Id.</u>) He had stopped drinking and had decreased his cigarette smoking to two to three a day. (<u>Id.</u>) He had no evidence of cyanosis, clubbing, or edema in his lower extremities. (<u>Id.</u>) He was in no apparent distress and was alert and oriented to time, place, and person. (<u>Id.</u>) He was diagnosed with nonischemic cardiomyopathy and was continued on his current dose of metoprolol. (<u>Id.</u> at 382.) He was encouraged to stop smoking and to seek a psychiatric consultation for his depression. (<u>Id.</u>)

Plaintiff saw David Kieffer, M.D., also with SLCC, on January 10 for complaints of left knee pain. (<u>Id.</u> at 312-13.) He had tenderness on palpation and motion of the knee. (<u>Id.</u> at 312.) He was diagnosed with osteoarthritis of the left knee and given a corticosteroid injection

in that knee.  (Id.)  He was also given prescriptions for Naprosyn, a nonsteroidal anti-inflammatory drug, and hydrocodone-acetaminophen.  (Id. at 313.)

On January 31, Plaintiff saw Ms. Campbell for his low back and bilateral knee pain and for his hepatitis.  (Id. at 308-10.)  He reported that the pain was a seven on a ten-point scale and that he was feeling tired or poorly.  (Id.)  He had no chest pain and no anxiety, but was trying to get an appointment with a psychiatrist for his depression and sleep problems.  (Id. at 309.)  Ms. Campbell noted that his depression needed to be under control before he could undergo treatment for his hepatitis.  (Id. at 310.)

When Plaintiff next saw Ms. Campbell, on March 7, he reported that his back, shoulder, and knee pain was an eight, but he was not anxious or depressed.  (Id. at 305-07.)  In addition to the hepatitis C, he was diagnosed with thrombocytopenia, a low platelet count, and advised that he was at risk for internal bleeding.  (Id. at 306.)  He was to return in four to six weeks. (Id. at 307.)

Plaintiff returned in four weeks.  (Id. at 301-04.)  His pain was then a ten.  (Id. at 301.) He was advised that his platelets remained high, a new treatment for his hepatitis would be considered.  (Id. at 303.)

Two days later, on April 6, Plaintiff was given another corticosteroid injection in his left knee.  (Id. at 300.)

On April 11, Plaintiff was seen by Dr. Hanna.  (Id. at 416-18, 429-30.)  He reported feeling tired, depressed, hopeless and worthless, and apathetic.  (Id. at 416.)  He was having difficulty falling asleep.  (Id.)  He had headaches and a lightheaded feeling.  (Id.)  He did not

have chest pain or discomfort.  (Id.)  His gait, stance, and grooming were normal.  (Id. at 417.)

His affect was flat; his mood was euthymic (neither depressed nor highly elevated).  (Id.)  Dr.

Hanna's diagnosis was severe recurrent major depression; Paxil was prescribed.  (Id.)  He was

referred to Hopewell Center to be seen by a psychiatrist.  (Id. at 418.)

Complaining of pain and swelling in his left knee, Plaintiff was seen at the emergency

room at Barnes Jewish Hospital seven days later after the bus he was riding in the night before

was hit by a car.  (Id. at 326-78.)  He walked with a steady gait and moved all his extremities

well.  (Id. at 329, 331.)  He did not use an assistive device.  (Id. at 330.)  There was minimal

swelling in his left knee.  (Id. at 330, 334.)  There were left paraspinous muscle spasms and

tenderness in his lumbar spine with occasional shooting pain radiating down his left thigh.  (Id.

at 334.)  He was in no apparent distress and had a normal affect, mood, and behavior.  (Id.)

His current medications included hydrocodone, metoprolol, and tramadol.  (Id. at 333.)  X-rays

of his lumbar spine revealed a mild compression deformity of the L1 vertebral body.  (Id. at

345.)  X-rays of his left knee revealed moderate patellofemoral compartment predominate

tricompartmental osteoarthritis with no underlying fracture.  (Id.)  Plaintiff was diagnosed with

a contusion of his left knee and lumbosacral, or low back, strain.  (Id. at 346, 354.)  He was

given prescriptions for tramadol and cyclobenzaprine (a muscle relaxant) and discharged

home.  (Id. at 346, 357, 363.)

In May, Plaintiff saw Dr. Hanna for continuing left knee pain and for back pain

following a motor vehicle accident.  (Id. at 321-23, 413-15.)  He was trying to get an

appointment with the Hopewell Center to be seen for his depression.  (Id. at 321.)  He was

drinking wine and beer every day and using heroin. (Id.) He was taking other people's medications. (Id.) His heart rate and rhythm were normal, as were his gait and stance. (Id. at 322-23.) He was diagnosed with benign essential hypertension and depression and given a prescription for, and samples of, Lexapro (an antidepressant). (Id. at 323.) He was to return to SLCC if his condition worsened or new symptoms arose. (Id.)

In June, Plaintiff received a third corticosteroid injection in his left knee. (Id. at 297-98.) His diagnoses included, in addition to the previous one of osteoarthritis of the left knee, spondylolisthesis without myelopathy. (Id. at 297, 298.)

Plaintiff underwent a psychological intake assessment by Mr. Smith, see note 2, supra, at the Hopewell Center on July 13. (Id. at 401-05.) He reported that he was depressed because his constant pain prevented him from taking care of himself. (Id. at 401.) He further reported he had not used heroin since the 1980s. (Id. at 403.) He stopped drinking after his mother's death and grieved that she died while he was daily drinking. (Id.) On examination, Plaintiff's behavior was appropriate for the interview; his mood was stable, but his affect was depressed; and his recent and remote memory were intact. (Id. at 404.) He was oriented to person, place, and time. (Id.) He complained of pain after sitting for a long time. (Id.) He was diagnosed with major depression, recurrent, and assessed as having a current and past Global Assessment

of Functioning (GAF) of 40.[7]  (Id.)  He was to be seen by Mr. Smith every two weeks.  (Id. at 400.)

Two days later, Plaintiff returned to Ms. Campbell for a follow-up on his hepatitis C. (Id. at 293-96.)  On examination, he had pain in his back and legs.  (Id. at 294.)  He was not anxious or depressed.  (Id.)  Her previous diagnoses were unchanged.  (Id.)  Ms. Campbell noted that his low platelets were a concern as the hepatitis treatment might cause them to further decrease.  (Id. at 295.)  The dates when he had stopped using alcohol and heroin had not changed.  (Id. at 293.)

Mr. Smith noted on July 29 that Plaintiff had missed his appointment for the day before and had not rescheduled.  (Id. at 399.)  A letter was mailed to Plaintiff about the importance of attending appointments.  (Id.)

On August 1, Plaintiff saw Dr. Hanna, reporting that he had lost his grandson two days earlier and was devastated by his death.  (Id. at 410-12.)  He was not sleeping well.  (Id. at 410.)  He complained of left knee pain and requested another referral for an injection.  (Id.)  Also, his back hurt.  (Id. at 411.)  His gait and stance were normal.  (Id.)  His wine and heroin use were as before.  (Id. at 410.)  His current medications included Lexapro and Paxil.  (Id. at

---

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

410.)  Dr. Hanna also prescribed Xanax and tramadol.  (Id. at 412.)  He was to return if his conditions worsened or new symptoms developed.  (Id.)

Plaintiff did see Mr. Smith on August 24, explaining that his grandson[8] had died the past week and, as a result, his fiancé had had a stroke.  (Id. at 395-98.)  She was recovering.  (Id. at 395.)  On examination, Plaintiff was marked on the checklist as having a well-groomed appearance, cooperative attitude, good insight and judgment, coherent speech, sad affect and mood, and normal memory.  (Id.)  He did not have any hallucinations, delusions, or suicidal or homicidal ideations.  (Id.)  He was not intoxicated.  (Id.)  The same day, Plaintiff saw Matthew Lindquist, R.N., P.M.H.R.N.  (Id. at 396-98.)  Plaintiff reported he was unable to leave the house, even to attend the grandson's funeral.  (Id. at 396.)  His sleep was poor, although medication prescribed by Dr. Hanna was helping.  (Id.)  His appetite was poor; his concentration was good; his energy was low.  (Id.)  He had not used heroin or alcohol for a year.  (Id.)  His diagnosis was the same as given him by Mr. Smith in July.  (Id. at 398.)  He was prescribed Cymbalta (an antidepressant) and trazodone (also an antidepressant).  (Id.)

Plaintiff informed Dr. Hanna when he saw her on September 12 that his symptoms were markedly improved on the Cymbalta.  (Id. at 408-09.)

Plaintiff reported to Mr. Lindquist on September 29 that he was doing better and not "'just laying around crying all the time.'"  (Id. at 394.)  His appetite and sleep were good.  (Id.)  His behavior was appropriate; his speech was normal; his thought process was logical; his

---

[8]The person is referred in the records of Mr. Lindquist as Plaintiff's step-grandson.

judgment and insight were fair.  (Id.)  He was not using alcohol or illicit drugs.  (Id.)  His prescriptions were renewed.  (Id.)

Plaintiff again reported to Dr. Hanna when he saw her in October that the Cymbalta was helping his depression.  (Id. at 406-07.)  He was not crying and was mentally better.  (Id. at 406.)  He continued, however, to have knee and back pain and had an orthopedic appointment the next month.  (Id.)  His current medication was Lexapro.  (Id.)  Dr. Hanna noted that Plaintiff was smiling more and was cheerful.  (Id. at 407.)  His gait and stance were abnormal; he was limping.  (Id.)  He was diagnosed with osteoarthritis of the knee and depression.  (Id.)

Also before the ALJ were assessments of Plaintiff's physical and mental residual functional capacities.

In May 2010, Plaintiff underwent a physical evaluation by Latanya C. Tunstall-Robinson, M.D.  (Id. at 263-68.)  Plaintiff reported that he had been diagnosed with arthritis in April 2010, but had been having symptoms for many years.  (Id. at 265.)  The pain caused him to stop working in 2004.  (Id.)  The tenderness in his knees, particularly in his right knee, prevented him from kneeling.  (Id.)  He also had bilateral shoulder pain, worse on the left than the right.  (Id.)  He did not take prescription medication for his pain, but often used his sister's Tylenol #4 or street Vicodin for pain relief.  (Id.)  Plaintiff further reported that he had low back pain for at least a year, preventing him  from bending over.  (Id. at 266.)  He could only walk 200 feet, and that was if he walked slowly and stopped frequently.  (Id.)  He used a golf club to help him walk.  (Id.)  When he was active, he was short of breath.  (Id.)  He had some swelling in his right ankle during the winter; the swelling was accompanied by severe pain.

(<u>Id.</u>)  Because of his pain and his shortness of breath, he lived in his sister's basement.  (<u>Id.</u>)
He has been depressed since his brother died two years earlier from liver cirrhosis.  (<u>Id.</u>)  He
used to drink alcohol daily, but stopped four months earlier because he has no money and has
too much difficulty climbing up and down the basement stairs.  (<u>Id.</u> at 267.)  His last IV use
of heroin was two years earlier.  (<u>Id.</u>)  Once or twice a month, he snorts it.  (<u>Id.</u>)  On
examination, Plaintiff was able to ambulate without use of an assistive device.  (<u>Id.</u>)  He
"appeared with a somewhat depressed mood" and was occasionally tearful.  (<u>Id.</u>)  He had very
poor hygiene.  (<u>Id.</u>)  He had a protuberant abdomen and enlarged liver.  (<u>Id.</u>)  He had
"numerous healed abscessed and needle track appearing scarring changes of the upper
extremities and lower extremities."  (<u>Id.</u> at 268.)  He had no tenderness to palpation of his
knees.  (<u>Id.</u>)  He was alert and oriented to time, place, and person.  (<u>Id.</u>)  "He had significant
limitation of range of motion."  (<u>Id.</u>)  He could flex at the waist to 50 degrees.  (<u>Id.</u> at 268,
264.)  He could flex his left shoulder to 95 degrees and his right to 90; 150 degrees was a full
flexion.  (<u>Id.</u> at 263.)  He could abduct his left shoulder to 35 degrees and his right to 75.  (<u>Id.</u>)
He could flex/extend his right knee to 120 degrees and his left to 130; full flexion-extension
was 150 degrees.  (<u>Id.</u>)  Straight leg raises were positive at 35 degrees on the right and 25
degrees on the left in a supine position.  (<u>Id.</u> at 264.)  There were no muscle tremors or
atrophy.  (<u>Id.</u> at 268.)  Dr. Tunstall-Robinson opined that the pain in Plaintiff's knees,
shoulders, and back was due to advanced osteoarthritis, not arthritis.  (<u>Id.</u>)  She also opined
that the probability he has liver cirrhosis was "very strong."  (<u>Id.</u>)  His depression was beyond
her area of expertise.  (<u>Id.</u>)

In June 2010, Plaintiff's depression was evaluated by Paul W. Rexroat, Ph.D. (Id. at 271-74.) Plaintiff reported that he had been convicted in 1980 of felony stealing, received probation, and convicted of petty stealing three times. (Id. at 271.) He explained that "'[w]hen [his] mother died [he] went down the wrong road.'" (Id.) Plaintiff reported that he uses heroin intermittently, with the last use being two months earlier. (Id. at 272.) He drinks a can of beer and a pint of wine three or four days a week. (Id.) On examination, he "was adequately dressed and groomed." (Id.) He had a normal range of emotional responsiveness and a normal affect, energy level, gait, and posture. (Id.) He was alert and cooperative. (Id.) His speech was normal, coherent, and relevant. (Id.) He had no evidence of a thought disorder. (Id.) He reported having occasional mood swings and being depressed for the last couple of years. (Id.) He stayed in bed all day, had a poor appetite, was easily irritated, cried a lot, had low self-esteem, and did not sleep well. (Id.) He had no paranoia or hallucinations. (Id.) He reported having a poor appetite and also a normal appetite. (Id.) On examination, his remote memory was fair. (Id.) As to his recent memory, he could recall what he had had for dinner the night before. (Id.) He appeared to be functioning in the low average range of intelligence. (Id. at 273.) "[H]e described significant symptoms of major depression, heroin abuse and alcohol abuse." (Id.) He could understand and remember simple instructions, could sustain concentration and persistence with simple tasks, and could adapt to his environment. (Id.) He had moderate limitations in his ability to interact socially. (Id.) He did not work. (Id.) Dr.

Rexroat's diagnosis was major depression, recurrent, moderate; alcohol abuse; and heroin abuse. (Id. at 274.) Plaintiff's current GAF was 49. [9] (Id.)

In July 2010, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by John Herberger, a single decision maker.[10] (Id. at 41-47.) The primary, and only, diagnosis was degenerative spondylolisthesis. (Id. at 41.) This impairment resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and sit, stand, or walk for approximately six hours in an eight-hour workday. (Id. at 42.) His ability to push and pull was otherwise unlimited. (Id.) He had postural limitations of never climbing ladders, ropes, and scaffolds and only occasionally kneeling, balancing, stooping, crouching, crawling, and climbing ramps and stairs. (Id. at 43.) He had no manipulative, visual, communicative, or environmental limitations. (Id. at 43-44.)

The same month, a Psychiatric Review Technique form was completed by Robert Cottone, Ph.D. (Id. at 278-89.) Plaintiff was reported to have an affective disorder, i.e., major depression disorder, and substance addition disorder, i.e., alcohol and heroin abuse. (Id. at 278, 281, 284.) These disorders resulted in mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in

---

[9] A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[10] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

maintaining concentration, persistence, or pace. (Id. at 286.) They also caused one or two episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Cottone rated Plaintiff as being markedly limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 290.) In the area of sustained concentration and persistence, Plaintiff was markedly limited in one of the eight listed abilities, i.e., the ability to carry out detailed instructions; moderately limited in three abilities, i.e., the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and was not significantly limited in the other four. (Id. at 290-91.) He was moderately limited in four of the five abilities in the area of social interaction and was not significantly limited in one. (Id. at 291.) And, Plaintiff was moderately limited in one of the four abilities in the area of adaptation, i.e., his ability to set realistic goals or make plans independently of others, and not significantly limited in the other three, including in his ability to respond appropriately to changes in the work setting. (Id.)

In October 2011, Mr. Smith completed a Mental Residual Functional Capacity Questionnaire on Plaintiff's behalf. (Id. at 436-40.) His diagnosis was major depressive disorder, recurrent (DSM-IV code 296.3). (Id. at 436.) He rated Plaintiff's GAF, current and past, as 40. (Id.) The symptoms of Plaintiff's depression were decreased energy; blunt, flat,

or inappropriate affect; feelings of guilt or worthlessness; mood disturbance; persistent disturbances of mood or affect; apprehensive expectation; recurrent obsessions or compulsions; persistent irrational fear of a specific object, activity, or situation; and sleep disturbance. (Id. at 437.) Because of his disorder, Plaintiff was unable to meet competitive standards in eleven of the sixteen listed mental abilities and aptitudes needed to do unskilled work and was seriously limited, but not precluded, in the remaining five. (Id. at 438.) Mr. Smith, did not, as requested, explain the limitations. (Id.) In three of the four listed mental abilities and aptitudes needed to do semiskilled and skilled work, Plaintiff was unable to meet competitive standards in three and was seriously limited, but not precluded, in one. (Id. at 439.) Again, Mr. Smith did not explain the limitations. (Id.) In the five listed mental abilities and activities needed to do particular types of jobs, Plaintiff was unable to meet competitive standards in three and was seriously limited, but not precluded, in two. (Id.) Mr. Smith explained that the limitations were due to Plaintiff's constant thoughts of his mother's death. (Id.) He anticipated that Plaintiff would miss more than four days of work a month due to his disorder. (Id. at 440.) The disorder was expected to last more than twelve months. (Id.) Another reason why Plaintiff would have difficulty working a regular job was the constant pain in his joints and back. (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2009, and has not engaged in substantial gainful activity since his alleged onset date of July 1, 2004. (Id. at 13.) The ALJ next found that Plaintiff has severe impairments of

degenerative changes of his left knee and lumbar spine; depression; polysubstance abuse is reported remission; and hepatitis C. (Id.) He had non-severe impairments of thrombocytopenia and history of tachycardia. (Id.) He did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id.) Specifically, his degenerative disc disease did not include a history of nerve root compression accompanied by limitation of motion of the spine, motor loss, or sensory or reflex loss.[11] (Id.) There was also no evidence of spinal stenosis resulting in, inter alia, an inability to ambulate effectively. (Id. at 14.) His mental impairments resulted in only mild restrictions in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in regard to concentration, persistence, or pace. (Id.)

With his impairments, Plaintiff has the exertional residual functional capacity (RFC) to perform light work and understand, remember, and carry out at least simple instructions and non-detailed tasks. (Id. at 15.) When making this determination, the ALJ reviewed the medical records. (Id. at 16-19.) The ALJ noted that Plaintiff's allegations of left knee and lumbar spine pain was supported by imaging studies, but also noted that a doctor did not attribute any severe limitations to that pain, the injections had provided relief, and surgery was never recommended. (Id. at 17.) A report by Plaintiff in May 2010 of being depressed for the past two years was followed the next month by a finding that his mood and affect were normal. (Id.) Plaintiff did not mention depression during his clinic visits until the May 2011

---

[11]The ALJ also said it was not accompanied by positive straight leg raises. The findings of Dr. Tunstall-Robinson, however, are that there were positive straight leg raises.

assessment.  (<u>Id.</u> at 18.) After a few sessions at the Hopewell Center, he reported a marked improvement with medication.  (<u>Id.</u>) His depression had improved with treatment, counseling, and medication.  (<u>Id.</u>) Detailing Plaintiff's varying accounts of his alcohol and heroin use and cessation, the ALJ found his polysubstance abuse to be closely associated with the depression. (<u>Id.</u>)  The ALJ further found that there was no evidence that the history of such abuse prevented Plaintiff from working.  (<u>Id.</u> at 19.)  Nor was there any evidence that Plaintiff's hepatitis C had resulted in any significant physical abnormalities.  (<u>Id.</u>)

In addition to the inconsistencies in the medical records, the ALJ considered other factors that he found detracted from Plaintiff's credibility.  (<u>Id.</u> at 19-20.)  For instance, during the telephone interview when Plaintiff was applying for DIB and SSI, there were no obvious limitations noted.  (<u>Id.</u> at 19.)  His work record was poor.  (<u>Id.</u>)  He gave inconsistent accounts of when he had stopped using heroin and alcohol.  (<u>Id.</u>)  He admitted getting street Vicodin for pain relief.  (<u>Id.</u>)  He had a distant history of a felony stealing conviction.  (<u>Id.</u> at 20.)  And, there was no evidence of treatment prior to his date last insured or when he filed his applications.  (<u>Id.</u>)  Although Plaintiff appeared to blame a lack of insurance for his lack of psychiatric care, he admitted having gone once to a free clinic for such care.  (<u>Id.</u>)  And, his demeanor at the hearing was unremarkable; his thoughts were organized.  (<u>Id.</u>)  He smiled during the hearing and responded to the questions.  (<u>Id.</u>)  The opinion of Mr. Smith was not accepted as it (a) was not by an acceptable medical source; (b) was based on only one session; (c) "include[d] the effects of recent, if not current, daily alcohol use," and (d) appeared to be based on Plaintiff's unquestioned allegations.  (<u>Id.</u>)

Next, the ALJ concluded that Plaintiff could return to his past relevant work as a commercial cleaner. (Id.) He was not, therefore, disabled within the meaning of the Act. (Id. at 21.)

### Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See

20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  "An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as []he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).  "At this step the ALJ may use a VE to assist him in making that decision by providing expert advice." **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006).  The burden at step four remains with

the claimant to prove his RFC and establish he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an

opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred when accepting the assessment of Dr. Cottone of his mental residual functional capacity and rejecting that of Mr. Smith's. This error led to a further error in not including the concrete consequences of his impairments in his hypothetical question to the VE.

The ALJ determined that Plaintiff's mental impairments resulted in mild restrictions in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. This determination varied from that of Dr. Cottone in that Dr. Cottone found Plaintiff's difficulties in social functioning to be moderate. As noted by Plaintiff, Dr. Cottone also found him to be moderately limited in his abilities to interact appropriately with the general public, to accept instructions, to respond appropriately to criticism from supervisors, and to get along with co-workers and peers without distracting them. (R. at 290-91.) The ALJ further determined that Plaintiff had the residual mental functional capacity to understand, remember, and carry out at least simple instructions and non-detailed tasks. This determination differed from that of Mr. Smith's, who assessed Plaintiff as being generally unable to meet competitive standards in any work-related mental abilities and activities.

Plaintiff argues there is a lack of a necessary explanation for Dr. Cottone's findings. On the other hand, Mr. Smith's findings are supported by the evidence of his treatment of Plaintiff and were improperly rejected.

There is nothing in the record or the ALJ's decision to suggest that he unquestionably incorporated Dr. Cottone's findings. Instead, the ALJ detailed the evidence, including the medical records and hearing testimony, of Plaintiff's depression. That evidence reveals that Plaintiff alleged depression as a disabling impairment when applying for DIB and SSI in February 2010. There is no evidence of him seeking treatment for such before his insured status ended on December 31, 2009. Indeed, the first evidence of a complaint of depression is a reference in the May 2010 consultative notes of Dr. Tunstall-Robinson. An evaluation of his depression followed the next month by Dr. Rexroat – four months before the treatment records of Ms. Campbell referred to Plaintiff *not* being anxious or depressed, six months before any reference in the medical records suggesting that Plaintiff should seek psychiatric care for depression, and thirteen months before he actually did so. Additionally, when Plaintiff was being evaluated by Dr. Rexroat he was intermittently using heroin and consistently drinking alcohol, but was still found to be able to understand and remember simple instructions and to sustain concentration and persistence with simple tasks – limitations consistent with the ALJ's RFC determination. Thus, whatever deficiencies or strengths there might be in the support of Dr. Cottone's findings, the ALJ's determination was not fatally infected. <u>See</u> **<u>Martise v. Astrue</u>**, 641 F.3 909, 927 (8th Cir. 2011) (noting in similar case in which the ALJ "had exhaustively reviewed the record medical evidence and made factual findings regarding this

evidence," that there was "no indication that the ALJ felt unable to make the assessment he did") (internal quotations omitted).

Plaintiff vigorously argues that the ALJ erred in discounting Mr. Smith's assessment. Specifically, he contends that the ALJ ignored Social Security Ruling 06-3p, ignored the regulations governing how medical opinion evidence should be evaluated, ignored evidence of Mr. Smith's sessions with Plaintiff, and erroneously failed to explain the inconsistencies between Mr. Smith's assessment and treatment notes.

It is undisputed that Mr. Smith, a licensed clinical social worker, is not an acceptable medical source, see 20 C.F.R. §§ 404.1513(a), 416.913(a), but is an "other source" under 20 C.F.R. §§ 404.1513(d), 416.913(d).  See **Sloan v. Astrue**, 499 F.3d 883, 888 (8th Cir. 2007). Under Social Security Ruling 06-3p, the factors for considering the opinion of an "other medical source" include:

> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;
>
> • How well the source explains the opinion;
>
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
>
> • Any other factors that tend to support or refute the opinion.

**Id.** at 889.

In the instant case, consideration of all but one of these factors militates against giving Mr. Smith's assessment any weight.

First, Mr. Smith first met Plaintiff on July 13, 2011, when conducting an intake assessment. He next, and last saw, him on August 24, 2011, although he was to see Plaintiff every two weeks.[12] Two months later, he issued his assessment.

Second, the assessment is *not* consistent with the other evidence. In addition to the inconsistencies detailed by the Commissioner between Mr. Smith's treatment notes and his assessment, see Commissioner's Brief at 10,[13] in the interval between Plaintiff's last visit to Mr. Smith and the assessment, he had told Dr. Hanna twice and Mr. Lindquist once that he was doing better after having started to take Cymbalta. Indeed, at his last medical visit before the assessment, he was reported by Dr. Hanna to be cheerful and smiling more. See **Davidson**, 578 F.3d at 846 ("Impairments that are controllable or amenable to treatment do not support a finding of disability."); accord **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).

Third and fourth, Mr. Smith presented *no* relevant evidence and no explanation to support his assessment. For two of the three categories of work-related activities and abilities he did not, as the form requested, explain any limitations. The explanation he gave for the

---

[12]The Court notes that Plaintiff cites eight pages in the record in support of his representation that there is evidence of Mr. Smith's visits with Plaintiff. (Pl.'s Br. at 18.) Six of those eight relate to the July intake assessment; one of the eight is of Plaintiff's August visit to Mr. Smith; and the eighth is Mr. Smith's notation that Plaintiff missed his appointment.

[13]The Court notes that "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009); **House v. Astrue**, 500 F.3d 741, 744 (8th Cir. 2007).

limitations in the third category, the death of Plaintiff's mother, was not given by Plaintiff as the reason for his depression when last seen by Mr. Smith. Moreover, the notes of Mr. Smith's one treatment session with Plaintiff are primarily in a checklist format. See **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) ("[A] conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little or no elaboration.") (internal quotations omitted); see also **Johnson v. Astrue**, 628 F.3d 991, 994 (8th Cir. 2011) (finding that an ALJ may properly reject treating physician's opinion consisting only of checkmarks).

Fifth, Mr. Smith's area of expertise, clinical social work, is arguably related to Plaintiff's impairment, but does not outweigh the detracting considerations set forth above.

Sixth, another factor that refutes Mr. Smith's opinion is its clear reliance on Plaintiff's description of his limitations. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **McCoy**, 648 F.3d at 617 (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on [claimant's] self-reported symptoms" which had been "found to be less than credible"); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence). The ALJ found, however, that Plaintiff was not credible. "If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court]

will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). Plaintiff does not challenge this finding.

Plaintiff does challenge the ALJ's consideration of his heroin and alcohol use, arguing that the ALJ failed to comply with the Commissioner's regulations, see 20 C.F.R. §§ 404.1535, 416.935, governing such consideration. (Pl.'s Br. at 19.) As in the instant case, the ALJ in **Fastner v. Barnhart**, 324 F.3d 981, 986 (8th Cir. 2003), considered the claimant's substance abuse to be an impairment, but concluded that he was not disabled. The Eighth Circuit found that a decision under the regulations whether substance abuse is a contributing factor material to a finding of disability "is only necessary if the ALJ has found that the sum of that individual's impairments would otherwise amount to a finding of disability." **Id.** The ALJ having found no disability, any decision about whether the abuse was a contributing factor was superfluous. **Id.**

Because the ALJ erroneously failed to give Mr. Smith's assessment the proper weight, he also failed, Plaintiff argues, to include the concrete consequences of his impairments in the hypothetical question he posed to the VE. "'[T]he ALJ's hypothetical question [to the VE] must include those requirements that the ALJ finds are substantially supported by the record as a whole.'" **Buckner**, 646 F.3d at 561 (quoting Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)). "'[A]n ALJ may omit alleged impairments from a hypothetical question posed to a [VE] when [t]here is no medical evidence that these conditions impose any restrictions on [the

claimant's] functional capabilities.'" **Id.** (quoting <u>Owen v. Astrue</u>, 551 F.3d 792, 801-02 (8th Cir. 2008)) (third and fourth alterations in original).  Because the ALJ's decision about Mr. Smith's assessment is supported by substantial evidence on the record as a whole, there is no error in the hypothetical questions.

"Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013).  For the reasons set forth above, Plaintiff has failed to carry this burden.

## Conclusion

Considering all the evidence in the record, including the evidence before the Appeals Council, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959,  964 (8th Cir. 2010).  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  26th  day of March, 2014.